**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SHEILA ALFORD, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 11-2121 (RMC) |
| PROVIDENCE HOSPITAL, | ) ) ) | |
| Defendant. | ) ) | |

**OPINION**

Sheila Alford was discharged by Providence Hospital after multiple on-the-job injuries because she had exhausted all leave and was unable to get to work. She sues here for alleged violations of the federal and District of Columbia family and medical leave statutes, as well as intentional and negligent misrepresentation. The parties have filed cross motions for summary judgment. Because Ms. Alford mischaracterizes additional personal leave granted by the Hospital as required by federal or D.C. law, and because there is no evidence to support her misrepresentation claims, summary judgment will be granted in favor of Providence Hospital.

**I. FACTS**

Sheila Alford worked for Providence Hospital as a secretary or front desk operator since July 1983 and has been a paraplegic requiring a wheelchair since 1991. Her job did not require her to perform heavy lifting. Ms. Alford experienced a workplace injury to her hand that required her to be away from work for a lengthy period, with job protection under the federal Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, and its local counterpart, the District of Columbia Family and Medical Leave Act (DCFMLA), D.C. Code.

§ 32-501 *et seq*. On March 31, 2010, an independent medical examiner declared the hand injury to be healed, and the Hospital then required Ms. Alford to report back to work. Ms. Alford alleges that, despite the fact that her hand had not fully healed, she returned to work. Soon thereafter, on April 2, 2010, Ms. Alford was injured as she arrived at work. She fell while transferring from her car to her chair in the Hospital parking lot, injuring her left shoulder, head, and neck. Am. Compl. [Dkt. 20] ¶ 11. She then took additional FMLA/DCFMLA leave.

Ms. Alford exhausted all federal FMLA and DCFMLA leave as of April 14, 2010.[1] Due to her injuries, however, she was not able to come back to work at that time. The Hospital's Human Resources Department (HR) notified her direct supervisor, Bonnie Lancaster, that Ms. Alford (1) could be terminated if there were an operational need to fill her position, or (2) could be granted an additional 60 days of personal leave. Def.'s MSJ [Dkt. 21-15], Ex. E (Apr. 29, 2010 Email) [Dkt. 21-6]. Ms. Lancaster chose the latter, and the Hospital granted Ms. Alford 60 days of personal leave without pay. *See id.*; Def.'s SOF [Dkt. 21-1] ¶ 5; Pl.'s Facts in Dispute at 2 (admitting that there are no genuine issues regarding Defendant's SOF ¶ 5). Ms. Alford took personal leave from April 14 to May 7[2] and then returned to work, before she had

---

[1] Hospital records demonstrate that Ms. Alford's FMLA and DCFMLA leave expired as of April 14, 2010. *See* Def.'s Statement of Facts [Dkt. 21-1] (Def.'s SOF) ¶¶ 3-4; Def.'s Mot. for Summ. J. [Dkt. 21-15] (Def.'s MSJ), Ex. A (Parker Aff.) [Dkt. 21-1]; *id.*, Ex. M (Jan. 25, 2011 letter from HR) [Dkt. 21-14]. Ms. Alford has been confused at times regarding the exhaustion date. *See* Def.'s MSJ, Ex. C (Pl.'s Answer to Interrog.) [Dkt. 21-4] at 6 (stating that her FMLA leave was exhausted on April 10, 2010 and that her DCFMLA leave was exhausted four weeks later); Pl.'s Opp'n [Dkt. 27] at 2 (referencing March 2010 as the exhaustion date). In her response to the Hospital's statement of undisputed facts, however, she agrees that she exhausted all FMLA and DCFMLA leave as of April 14, 2010. *See* Pl.'s Statement of Facts in Dispute [Dkt. 27-1] (Pl.'s Facts in Dispute) at 2 (admitting that there are no genuine issues regarding Defendant's SOF ¶¶ 3-4, asserting the April 14 exhaustion date).

[2] *See* Def.'s Opp'n [Dkt. 25], Ex. O (Hospital's Answer to Interrog.) [Dkt. 25-3] at 2-3 (setting forth Ms. Alford's 2010-2011 leave record).

exhausted the 60 additional days of personal leave. Am. Compl. ¶ 13. Ms. Alford worked for the Hospital until December 3, 2010.[3] *Id.*

On December 3, 2010, Ms. Alford reported to the Hospital's Occupational Health Department (OHD) crying and complaining that she had shoulder pain and decreased range of motion. *See* Def.'s MSJ, Ex. G (OHD Medical Records) [Dkt. 21-8] at 2 (patient reported pain level of 9 on a 10 point scale). OHD sent her to the Hospital's Emergency Department for treatment and directed her to return to OHD on December 7, 2010 for clearance to return to work. *Id.* On the morning of December 7, before coming to the Hospital, Ms. Alford saw Dr. Wilson.[4] She complained of pain and upon examination, Dr. Wilson determined that she suffered from trapezius tenderness, limited range of motion in her shoulder, and an acute cervical [neck] sprain. *Id.*, Ex. H (Medical Records of Dr. Wilson) [Dkt. 21-9] at 2. Ms. Alford requested time off from work, until December 14; accordingly, Dr. Wilson signed a disability certificate excusing her from work through that date. *Id.* at 2, 4. He instructed her not to lift anything weighing more than 10 pounds. *Id.* at 4. Ms. Alford presented the disability certificate to OHD on December 7. *Id.*, Ex. F (Abbott Dep.) [Dkt. 21-7] at 105. At that time, Ms. Alford expressed "concern" about her ability to lift her 48-pound wheelchair to get it in and out of her car. OHD Medical Records at 4. The Hospital released her from work and instructed her to

---

[3] Upon her return to work in May 2010, Ms. Alford continued to see an orthopedist, Robert Wilson, M.D. Am. Compl. ¶ 14. She saw Dr. Wilson five times between May 5 and October 27, 2010.

[4] Ms. Alford had two outstanding workers' compensation claims—one for injury to her hand and the other for injury to her shoulder and upper body. The record does not distinguish doctor visits/reports related to those injuries and those related to her difficulty getting herself to work due to an inability to lift her wheelchair in and out of her car. Because Ms. Alford does not contest her difficulties with her wheelchair, but argues that medically-imposed weight restrictions did not impact her performance on the job, the Court does not parse out which doctors Ms. Alford saw at the request of the Hospital's workers' compensation administrator, which doctors she saw on her own, and which doctors she saw at the Hospital's direction.

report back to OHD on December 14 for follow-up and work clearance. Abbott Dep. at 57; OHD Medical Records at 5. When she left the Hospital on December 7, a security officer was directed to help her get her wheelchair into her car, since it was too heavy for her to lift, and it was noted that her husband would help her get out when she got home. *Id*. at 4.

On December 14, 2010, Ms. Alford told OHD that her shoulder pain had not improved and she could not transport herself to work. Abbott Dep. at 66, 76, 78; OHD Medical Records at 6. Because she could not transport herself, OHD arranged transportation for Ms. Alford to see Dr. Wilson on December 15, 2010. OHD Medical Records at 6. At the December 15 appointment, Ms. Alford reported to Dr. Wilson that she still had shoulder trouble and was having difficulties getting to work. Medical Records of Dr. Wilson at 5. Dr. Wilson cleared Ms. Alford to return to work with a 20-pound lifting restriction, *id*., still less than the weight of her wheelchair. *Id*. In her deposition, Ms. Alford admitted that the 20 pound lifting restriction prohibited her from lifting her wheelchair, which weighs more than 40 pounds. Pl.'s Opp'n [Dkt. 27], Ex. 3 (Alford Dep.) [Dkt. 27-4] at 27. Despite being cleared by Dr. Wilson to return to work, Ms. Alford did not do so.

On December 17, 2010, Sedgwick Claims, a third party administrator that processes workers' compensation claims filed by Hospital employees, sent Ms. Alford a letter directing her to undergo an independent medical examination (IME). Def.'s Opp'n [Dkt. 25], Ex. P (Dec. 17, 2010 Letter to Ms. Alford) [Dkt. 25-4]; Am. Compl. ¶¶ 18, 20.[5] Dr. John O'Connell conducted the IME on January 3, 2011. Dr. O'Connell concluded that although Ms. Alford could drive, she could not lift more than 10 pounds. Def.'s Opp'n, Ex. R (IME Report)

---

[5] OHD asked the workers' compensation administrator if workers' compensation would provide transportation to Ms. Alford to enable her to get to and from work, but the administrator declined. Def.'s MSJ, Ex. I (12/22/2010 Email from Ms. Abbott) [Dkt. 21-10] at 1.

4

[Dkt. 25-6] at 6.  He also reported that she could not lift her wheelchair in and out of her car, but that with four to six weeks of physical therapy she should be able to do so.  *Id*. at 7.

Seeing little progress in Ms. Alford's ability to get herself to work, personnel from HR and OHD met on January 6, 2011, to discuss Ms. Alford's employment status.  OHD advised that Ms. Alford could not transport herself to work, and the Hospital determined that there was an operational need to fill Ms. Alford's position.  Because she had exhausted all FMLA and DCFMLA leave in April 2010 and she had been unable to work since December 3, 2010, the Hospital terminated Ms. Alford.  Am. Compl. ¶¶ 33, 34.  By letter dated January 25, 2011, the Hospital notified her of her termination, effective as of January 7, 2011.  *Id*. ¶ 32; Def.'s MSJ, Ex. M (Jan. 25, 2011 Letter from HR to Ms. Alford) [Dkt. 21-14].

Arising from these circumstances, Ms. Alford brought suit against the Hospital.  She characterizes the additional 60 leave days that the Hospital had granted to her in the spring of 2010 as additional statutory FMLA/DCFMLA leave, and contends that because she did not exhaust this leave she was protected from termination by the FMLA and the DCFMLA.  She also baldly alleges, despite evidence to the contrary, that her condition did not prevent her from going to work.  She claims that she stayed out of work because LaToya Abbott of OHD told her to remain home until she was cleared to return by an independent medical exam.  She filed an Amended Complaint consisting of five Counts:

>Count I – violation of the FMLA;

>Count II – violation of the DCFMLA;

>Count III – retaliation under the FMLA and the DCFMLA;

>Count IV – Intentional Misrepresentation; and

>Count V – Negligent Misrepresentation.

5

Ms. Alford seeks monetary damages, damages for pain and suffering, punitive damages, and attorney fees.[6]  The parties have filed cross motions for summary judgment.

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  On summary judgment, the burden on a moving party who does not bear the ultimate burden of proof in the case may be satisfied by making an initial showing that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id*.

The burden then shifts to the nonmovant to demonstrate the existence of a genuine issue of material fact.  The nonmovant may not rest on mere allegations or denials, but must instead by affidavit or otherwise, present specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c);  *Celotex*, 477 U.S. at 324; *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (nonmovant must present specific facts that would enable a reasonable jury to find in its favor).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor.  *Anderson*, 477 U.S. at 255.  A nonmoving party,

---

[6] Recovery under FMLA is limited to actual monetary losses.  *Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1277 (10th Cir. 2001); *see* 29 U.S.C. § 2617(a)(1)(A)(i).  Other kinds of damages—such as punitive damages and damages for emotional distress—are not recoverable.  *Settle v. S.W. Rodgers Co., Inc.*, 998 F. Supp. 657, 666 (E.D. Va. 1998), *aff'd*, 182 F.3d 909 (4th Cir. 1999).  Recovery under the DCFMLA is similarly limited to monetary loss.  *See* D.C. Code § 32-509.

however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, if the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III.  ANALYSIS

#### A.  FMLA and DCFMLA

Under certain circumstances, the FMLA and its DC counterpart, the DCFMLA, grant an employee the right to take temporary medical leave from employment, with protection from the threat of, or actual, termination from her job. The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The DCFMLA provides that "any employee who becomes unable to perform the functions of the employee's position because of a serious health condition shall be entitled to medical leave for as long as the employee is unable to perform the functions, except that the medical leave shall not exceed 16 workweeks during any 24-month period." D.C. Code § 32-503.

Under the FMLA, a plaintiff may state: (1) an interference claim under § 2615(a)(1), alleging that her employer has restrained, denied, or interfered with her substantive rights under the Act, and/or (2) a retaliation claim under § 2615(a)(2), alleging that her employer has taken adverse action against her because she took leave or engaged in activity protected by

the Act, such as by filing a complaint. *Roseboro v. Billington*, 606 F. Supp. 2d 104, 107-08 (D.D.C. 2009); *see Strickland v. Waterworks & Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 n.9 (11th Cir. 2001) (while the FMLA does not clearly label claims as alleging "interference" or "retaliation," those are the labels courts have used to describe violations of the Act). Claims under the DCFMLA similarly include claims for interference and claims for retaliation. D.C. Code § 32-507(a) (interference); *id.* § 32-507(b)(1) (retaliation).

Ms. Alford alleges interference claims, *i.e.*, that when she was terminated, she was denied the rights and protections of the FMLA and the DCFMLA. *See* Am. Compl., Counts I and II. She also alleges retaliation claims, *i.e.*, that the Hospital terminated her in retaliation for having exercised her rights under the FMLA and the DCFMLA. *Id.*, Count III.

### 1. Interference

Ms. Alford alleges that the Hospital did not permit her to return to work in January 2010 in violation of the FMLA and the DCFMLA. As described above, the FMLA provides an employee with 12 weeks of unpaid leave in a 12-month period due to a serious health condition that renders the employee unable to perform her job, 29 U.S.C. § 2612(a)(1)(D), and the DCFMLA provides 16 weeks of leave in a 24-month period under similar circumstances. D.C. Code § 32-503(a). Once these periods are exhausted, an employer is not required to hold the employee's job for her eventual return. In other words, the Acts do not provide a guarantee that employment will continue if the unpaid leave expires and the employee is still unable to return to work. "[A]n employee who exceeds the permitted FMLA leave time has no right to be restored to his or her job." *Austin v. Fuel Sys., LLC*, 379 F. Supp. 2d 884, 889 (W.D. Mich. 2004); *see* 29 C.F.R. § 825.216(c) (an employee who is unable to perform an essential function of his job due to a physical or mental condition has no right to job restoration under the FMLA).

The FMLA and the DCFMLA permit termination when an employee remains absent from work after her qualified leave expires. *Roseboro*, 606 F. Supp. 2d at 111; *see Etheridge v. FedChoice Fed. Credit Union*, 789 F. Supp. 2d 27, 39-40 (D.D.C. 2011) (after plaintiff received her full 16 weeks off and she was unable to return to work, her termination did not violate the DCFMLA).[7]

Ms. Alford exhausted both her FMLA and her DCFMLA leave by April 14, 2010. *See* Def.'s SOF ¶¶ 3-4; Pl.'s Facts in Dispute at 2 (admitting that there are no genuine issues regarding Def.'s SOF ¶¶ 3-4). Thus, Ms. Alford remained an employee entitled to job restoration under FMLA/DCFMLA until April 14, 2010. At that point, the Hospital could lawfully require her to return to work or lose her position.

Instead of imposing such a requirement, the Hospital granted Ms. Alford an additional 60 days of leave. Ms. Alford did not use all 60 days before she returned to work in early May 2010. She now argues that the Hospital had an obligation to allow her to use the remainder of such leave in December 2010, when shoulder pain forced her out of work again.[8] She posits that the additional 60 days of leave was an extension of her FMLA and DCFMLA statutory leave and that her discharge in January 2011 resulted from her exercise of statutory rights in taking protected leave.

Ms. Alford overlooks the fact that she did, in fact, receive all statutory leave to which she was entitled under federal and local law and her job was protected throughout. She exhausted the last of such leave on April 14, 2010. Her discharge in January 2011 cannot

---

[7] Courts interpret the FMLA and the DCFMLA similarly. *Cobbs v. Bluemercury, Inc.*, 746 F. Supp. 2d 137, 142 (D.D.C. 2010). Accordingly, this Court applies the case law arising from suits involving the FMLA to Ms. Alford's claims under the DCFMLA.

[8] The Hospital notes that, if it applied, the remainder of the 60 days of extended personal leave would have been exhausted as of January 7, 2011, the last date of Ms. Alford's employment. Hospital's Answer to Interrog. at 2-3.

constitute interference with her FMLA or DCFMLA rights because all such rights were recognized and exhausted more than nine months earlier.

In opposition to summary judgment and in support of her own dispositive motion, Ms. Alford labels the additional 60 days of leave as "constructive," "extended," or "additional" FMLA/DCFMLA leave. Pl.'s Opp'n at 2; Pl.'s Mot. for Summ. J. (Pl.'s MSJ) [Dkt. 22] at 10. This characterization of the 60-day leave period overlooks an elementary concept: statutes are adopted by federal and local legislatures and cannot be amended by private companies or citizens. The Hospital had no power or authority to extend Ms. Alford's *statutory* medical leave because the Hospital is neither the U.S. Congress nor the D.C. City Council. Rather, the Hospital granted Ms. Alford an additional 60 days of personal leave, which no law required it to do. It may be that Ms. Alford's years of service to the Hospital, since 1983, prompted this extension. The rationale for granting additional leave is not revealed in the record. That rationale is not relevant, however, to whether the additional 60 days constituted statutory or personal leave. Since it was clearly the latter, Ms. Alford's claims of interference with FMLA and DCFMLA rights have no merit.

Ms. Alford further argues that the Hospital should not be allowed to terminate her in January 2011 based on the exhaustion of her FMLA/DCFMLA leave nine months prior because the exhaustion of leave was too distant in time. *See* Pl.'s Opp'n at 12 (arguing that Defendant should not be allowed to "reach back" so far in time for a reason for termination); *id*. at 16 (arguing that the Court should impose a temporal proximity requirement and Ms. Alford's exhaustion of protected leave time was too distant in time from her termination). Ms. Alford's argument is based on a false premise—that the Hospital terminated her for using her FMLA and DCFMLA leave. In fact, the Hospital's reason for termination on January 7, 2011 was that Ms.

Alford was unable to come to work at that time and for the foreseeable future. Because she had exhausted her FMLA/DCFMLA leave the prior spring, those statutes no longer protected her job.

Ms. Alford also contends that the modified duty restrictions of 10 and 20 pounds imposed by Drs. Wilson and O'Donnell should not have been factored into the Hospital's reasoning for terminating her since neither restriction impacted her ability to perform her job, a desk job that required no lifting. The Hospital does not contend that the weight restrictions impeded Ms. Alford's ability to do her job, once she arrived at work. Those restrictions, however, were directly germane to the question of whether she could get herself to work. Attendance is a basic necessity for all jobs. On and after December 3, 2010, Ms. Alford repeatedly made it clear to OHD and to her doctors that she had shoulder pain; that she could not lift her wheelchair in and out of her car; and that she could not transport herself to work. *See* OHD Medical Records at 4, 6 (Ms. Alford was concerned with lifting her 48-pound wheelchair overhead to get it in and out of her car; OHD directed a security guard to help her into her car; OHD arranged transportation to Dr. Wilson's office); Medical Records of Dr. Wilson at 5 (Ms. Alford reported that she was having difficulties getting to work). Drs. Wilson and O'Donnell limited her to lifting 10 or 20 pounds, significantly less than the weight of her wheelchair. *See* Medical Records of Dr. Wilson at 4-5; IME Report at 6. *A priori*, she could not single-handedly get herself into her car, to the Hospital, out of her car, to her desk to work, and back home again. The Hospital was legally permitted to discharge Ms. Alford after she had expended her allotted FMLA and DCFMLA leave and she remained unable to get herself to work.

Ms. Alford attempts to revise history by alleging that despite her acute cervical sprain and shoulder pain she was ready, willing, and able to return to work at any time after December 3, 2010, that the Hospital put her on "involuntary" leave starting on that day, and she

11

stayed out of work in compliance with Ms. Abbott's directive that she should do so. *See* Pl.'s Opp'n at 2, 14; *id*. at 10 (alleging that the Hospital terminated Ms. Alford despite her "desire and ability to return to work"); Alford Dep. at 27 (explaining that her husband could assist her or she could use Metro Access (public transportation which accommodates persons in wheelchairs), and stating that "[t]here was no issue about getting to work or anything like that"). In ruling on the Hospital's motion for summary judgment, the Court recognizes that it must draw all justifiable inferences in Ms. Alford's favor and accept her evidence as true. *See Anderson*, 477 U.S. at 255. Even so, the Court is not required to accept as true Ms. Alford's bald, conclusory allegations. In response to the Hospital's motion, Ms. Alford may not rest on mere allegations or denials, but must instead present specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324; *Greene*, 164 F.3d at 675. Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Reetz v. Jackson*, 176 F.R.D. 412, 414-15 (D.D.C. 1997) (a plaintiff cannot create a genuine issue of material fact by contradicting her own deposition testimony).

Ms. Alford has not presented any evidence that corroborates her own self-serving testimony that she was ready, willing, and able to get to the Hospital to work; in fact, her allegations and deposition testimony are directly contradicted by both the record and her own prior statements. The evidence demonstrates that Ms. Alford was not able to return to work from December 3, 2010 to the date she was terminated, January 7, 2010, due to her inability to transport herself. Ms. Alford's own admissions reveal that she suffered from severe shoulder pain on December 3, 2010. OHD Medical Records at 2 (patient reported pain level of 9 on a

scale of 1-10). On December 7, 2010, she asked for more time off, *see* Medical Records of Dr. Wilson at 2, and reported "concern" with lifting her 48-pound wheelchair overhead to get it in and out of her car. *See* OHD Medical Records at 4. On December 15, 2010, she reported to Dr. Wilson that she was having difficulties getting to work. Medical Records of Dr. Wilson at 5. In December 2010 and January 2011, Drs. Wilson and O'Donnell limited her to lifting 20 pounds or less, which meant she could not lift her wheelchair. *See* Medical Records of Dr. Wilson at 4-5; IME Report at 6.

Ms. Alford's attempt to create an issue of material fact that would preclude summary judgment in favor of the Hospital fails. The Hospital's motion for summary judgment will be granted, and Ms. Alford's cross motion will be denied. Judgment will be entered in favor of the Hospital on Counts I and II.

## 2. Retaliation

Ms. Alford alleges in Count III of the Amended Complaint that the Hospital terminated her employment in retaliation for her having taken FMLA/DCFMLA leave in the spring of 2010. The *McDonnell Douglas*[9] framework applies to retaliation claims. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010). Under that burden-shifting framework, an employee may establish a prima facie case creating a presumption of retaliation by showing that (1) she exercised rights afforded by the [FMLA or DCFMLA]; (2) she suffered an adverse employment action; and (3) there was a causal connection between the exercise of her rights and the adverse employment action. *See Roseboro*, 606 F. Supp. 2d at 109. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate basis for

---

[9] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

the adverse action; then the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.; Dorsey v. Jacobson Holman*, *PLLC*, 756 F. Supp. 2d 30, 37 (D.D.C. 2010).

Ms. Alford has not established a prima facie case of retaliation. When a plaintiff relies on temporal proximity to establish causation, events must have occurred close in time. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (under Title VII, 42 U.S.C. § 2000e *et seq.*, three months is too long to show proximity demonstrating causation); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004) (three months is the "outer limit" of temporal requirement under Title VII). Here, Ms. Alford exhausted her FMLA and DCFMLA leave on April 14, 2010. The Hospital terminated her nine months later, in January 2011. Due to the nine-month passage of time, Ms. Alford has not shown a causal connection between the exercise of her FMLA and DCFMLA rights and her termination.

Even if Ms. Alford had a prima facie case, her claim for retaliation still would fail as the Hospital proffers a legitimate reason for termination—because she could not lift her wheelchair, Ms. Alford could not transport herself and could not come to work. Ms. Alford presents no evidence that the reason was pretextual. In sum, because she could not get to work, Ms. Alford stopped going to work on December 3, 2010. The Hospital had a legitimate, non-discriminatory reason for terminating Ms. Alford—she was unable to come to work. Accordingly, the Hospital's motion for summary judgment will be granted, and Ms. Alford's motion will be denied. Judgment will be entered in favor of the Hospital on Count III, retaliation under the FMLA and DCFMLA.

### B. Fraudulent Misrepresentation

Count IV of the Amended Complaint alleges fraudulent misrepresentation. Ms. Alford alleges that LaToya Abbott directed her to stay out of work until she underwent

independent medical examinations and was cleared to return to work. Ms. Alford asserts that she complied with this directive, but the Hospital terminated her for failing to come to work. Ms. Abbott denies that she told Ms. Alford to remain at home or that she directed Ms. Alford to submit to an independent medical examination as a condition precedent to return to work. Abbott Dep. at 78, 80. The nature and extent of any such conversation is not material to the disposition of the cross motions for summary judgment.

In order to establish fraudulent misrepresentation under D.C. law, a plaintiff must prove by clear and convincing evidence that (1) there was a false representation; (2) made about a material fact; (3) with knowledge of its falsity or with reckless indifference to knowledge of its falsity; (4) with intent to deceive; and (5) plaintiff acted in reliance on the misrepresentation. *In re Estate of McKenney*, 953 A.2d 336, 342 (D.C. 2008).

Ms. Alford has not provided evidence that she acted in reliance on this alleged misrepresentation. On summary judgment, she may not rely solely on conclusory and self-serving allegations, but must present specific facts that would enable a reasonable jury to find in her favor. *Greene*, 164 F.3d at 675. Her allegation that she remained away from work in reliance on Ms. Abbott's directive is clearly contradicted by the record. *See Scott*, 550 U.S. at 380 (on summary judgment, a court should not rely on allegations blatantly contradicted by the record). As detailed above, the record reveals that Ms. Alford was in pain and could not transport herself to work; that she requested time off; and that her doctors restricted her lifting to 10-20 pounds, much less than the weight of her wheelchair. Ms. Alford remained away from work because she was unable to transport herself there.

In her response to the Hospital's motion for summary judgment, Ms. Alford advances a series of allegedly disputed and material facts. Her disputes, however, are distinctly

marginal. Moreover, she does not actually contest any of the material facts bearing on Ms. Abbott's understanding of Ms. Alford's inability to get to work.

Ms. Alford contends that she was cleared to return to work by the Emergency Department on Monday, December 6, 2010, but Ms. Abbott told her to return to work on the next day, after her appointment with Dr. Wilson. Pl.'s Notice [Dkt. 23], Pl.'s Facts Not in Dispute [Dkt. 23-1] ¶¶ 1-2. She also alleges that she did not *ask* Dr. Wilson for a disability certificate, *see* Pl.'s Facts in Dispute [Dkt. 27-1] ¶ 9, and that "there was no issue about getting to work or anything like that," *see* Alford Dep. at 27; more to the point, Ms. Alford asked Dr. Wilson for time off of work, Dr. Wilson provided a disability certificate, and she submitted it to the Hospital on December 7, thereby excusing her from work through December 14. *See* Medical Records of Dr. Wilson at 2, 4. She asserts that she did not call Ms. Abbott on December 14 because it was Ms. Abbott who placed the call, and she asserts that "without reason" Ms. Abbott extended her leave from December 14 to December 20 and arranged transport for Ms. Alford to see Dr. Wilson on December 15—but she does not contest that she told Ms. Abbott that her pain still had not improved, that she was having difficulties driving, and that she could not transport herself to work. Pl.'s Facts in Dispute ¶¶ 13-14. Ms. Alford notes that Dr. Wilson was puzzled to see her on December 15 and cleared her to work with a 20-pound lifting restriction, yet Ms. Alford does not contest that she told Dr. Wilson that she was "having difficulties getting to work." *Id*. ¶¶ 16-17. Ms. Alford claims that she never advised Ms. Abbott that anything prevented her from lifting her wheelchair in and out of her car but acknowledges, as she must, that Ms. Abbott advised other managers in HR that Ms. Alford could not "lift[] her wheelchair to get in and out of her automobile," without attributing the statement to Ms. Alford. *Id.* ¶ 18; *see* Ex. I (12/22/2010 Email from Ms. Abbott) [Dkt. 21-10]. Further, Ms. Alford admits

16

that "[a]t the time of that meeting [on January 6, 2011, to discuss Ms. Alford's employment] it was Ms. Abbott's understanding based on her conversations with Alford that she was still unable to transport herself to work."  Pl.'s Facts in Dispute ¶ 20.

The disputes identified by Ms. Alford do not advance her case.  The question is not whether, once at the Hospital and at her desk, she could have performed her job.  The lifting restrictions imposed by doctors who examined Ms. Alford in this time period would not have prevented her job performance.  The question is not even whether she could have, in fact, gotten herself to and from work despite her pain.  Rather, the question with regard to Count IV is whether there is clear and convincing evidence that Ms. Abbott falsely represented a material fact to Ms. Alford that Ms. Abbott knew or did not care was false, with the intention of deceiving Ms. Alford.  There is no evidence to support the allegation, much less clear and convincing evidence, as admitted by Ms. Alford herself:  she admits that there are no genuine issues of material fact as pertains to the Hospital's statement that at the time of the January 6, 2011 meeting to discuss Ms. Alford's job it was Ms. Abbott's understanding based on her conversations with Ms. Alford that Ms. Alford was still unable to transport herself to work.  *See id.* ¶ 20.

Inasmuch as Ms. Abbott understood that Ms. Alford could not transport herself to work *based on what Ms. Alford had told her*, and since the Hospital terminated Ms. Alford because she could not meet the basic job requirement of getting to work, the allegation that Ms. Abbott engaged in fraudulent misrepresentation that injured Ms. Alford fails.  Because Ms.

Alford has failed to raise a genuine issue of material fact, summary judgment will be granted in favor of the Hospital on Count IV, the claim of intentional misrepresentation.[10]

### C. Negligent Misrepresentation

Count V of the Complaint, alleging negligent misrepresentation, repeats Count IV as a matter of negligence, not fraud. Count V asserts that Ms. Abbott negligently and falsely told Ms. Alford that her return to work was contingent on passing additional independent medical examinations. To establish negligent misrepresentation, a plaintiff must prove that (1) defendant made a false statement or omitted a fact he had a duty to disclose; (2) the false statement or omitted fact was material; and (3) the plaintiff reasonably relied on the false statement or omission to his detriment. *Redmond v State Farm Ins. Co.*, 728 A.2d 1202, 1207 (D.C. 1999). For the same reasons that apply to the claim of intentional misrepresentation, summary judgment will be granted in favor of the Hospital on the claim of negligent misrepresentation.

### IV. CONCLUSION

For the reasons stated above, the Hospital's motion for summary judgment [Dkt. 21] will be granted, Ms. Alford's motion for summary judgment [Dkt. 22] will be denied, and

---

[10] While at a glance Count IV might be read to allege fraudulent concealment, on closer examination it does not state such a claim. Count IV alleges that Ms. Abbott intentionally failed to inform Mr. Fabiyi that she had told Ms. Alford to stay home. To prove fraudulent concealment, a plaintiff must show by clear and convincing evidence that (1) the defendant had a duty to disclose a material fact to the plaintiff; (2) the defendant failed to disclose the fact; (3) the defendant had an intention to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the concealment. *Alexander v. Wash. Gas Light Co.*, 481 F. Supp. 2d 16, 36-37 (D.D.C. 2006). Count IV does not state a claim for fraudulent concealment, however, as it asserts that Ms. Abbott concealed material information from Mr. Fabiyi—not that Ms. Abbott concealed information from *Ms. Alford*.

judgment will be entered in favor of the Hospital.  A memorializing Order accompanies this Opinion.[11]

Date:  May 23, 2013

/s/
ROSEMARY M. COLLYER
United States District Judge

---

[11] The previously scheduled trial date for this case will be vacated.